# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

NICHOLAS CAPPELLETTI,
Individually and as trustee of the
NICHOLAS CAPPELLETTI INCOME
TRUST,

      Plaintiff,

v.

PUTMAN MEDIA, INC., a Delaware
corporation,

      Defendant.

Case No.: 16_____

Hon._____

Paul A. McCarthy (P47212)
RHOADES MCKEE, PC
Attorneys for Plaintiff
55 Campau Ave. N.W.
Grand Rapids, MI 49503
(616) 233-5133

## COMPLAINT

Nicholas Cappelletti, individually and a trustee of the Nicholas Cappelletti Income Trust,

states as follows:

## CASE OVERVIEW

Putman Media Inc. ("Putman") is a family business, owned by the Cappelletti family. Plaintiff is a 22% shareholder. In 2004, Plaintiff exited management of Putman and entered into a Put/Option Agreement with the company. On November 3, 2015, Plaintiff exercised his mandatory put option, under which Putman was obligated to redeem Plaintiff's stock based on a Floor Value of $20 million. Putman must redeem Plaintiff at the $20 million Floor Price company value unless the transaction would "cause the Company to be in violation of any applicable insolvency or other law." Putman, led by Plaintiff's brother, John Cappelletti, wanted to avoid its obligation to Plaintiff because the $20 million Floor Value – cast in stone in 2004 – was regarded as too high by the Cappelletti board members and shareholders in 2015, more than eleven years later. Acting out of their own personal financial interest, the Cappelletti board

members and shareholders contrived a "preliminary" and unsigned solvency analysis – itself containing an obvious and outcome-changing error – which suggests that the transaction Putman seeks to avoid would render it insolvent by the thinnest of margins, specifically $36,000, or 1% of the transaction value. In denying Plaintiff's mandatory put option, Putman's board of directors did not act in good faith, or on the basis of appropriate data or assumptions, and its conclusion that honoring the mandatory put option would render the company insolvent is so far off the mark as to constitute actual or constructive fraud. Putman is in breach of the 2004 Put/Option Agreement and Plaintiff seeks damages in the amount of $3,362,000, the value of his mandatory put option.

## THE PARTIES AND JURISDICTION

1. Nicholas Cappelletti ("Plaintiff") is an individual and resident of Saugatuck, Michigan.

2. Plaintiff owns approximately 14% of the stock in Putman Media, Inc. ("Putman").

3. Plaintiff is also the trustee of the Nicholas Cappelletti Income trust, which trust owns approximately 8.1% of the stock in Putman Media, Inc.

4. Individually and through his trust, Plaintiff owns slightly more than 22% of Putman's stock.

5. Putman Media, Inc. is a Delaware corporation that is headquartered in Schaumburg, Illinois.

6. Plaintiff seeks damages in the amount of $3,362,000, plus interest and attorneys' fees where recoverable by law.

7. The amount in controversy exceeds $75,000, the parties are citizens of different states and, accordingly, this Court has jurisdiction over this matter under 28 U.S.C. §1332(a)(1).

## STOCK OPTION ATTENDS PLAINTIFF'S EXIT FROM PUTMAN IN 2004

8. Putman is a family business, owned by the Cappelletti family members.

9. Plaintiff formerly served as a member of Putman's management team.

10.     Prior to her resignation in April of 2004, Putman was managed by Grace Cappelletti, Plaintiff's mother, who served as the sole director for Putman.

11.     As Grace was preparing to transition the company, Plaintiff and his brother John were competing for the opportunity to run the family business.

12.     The competition between brothers created friction.

13.     Grace Cappelletti, the owner and family matriarch, selected John Cappelletti to run Putman and encouraged Plaintiff to step away from the company but under an arrangement that would ensure Plaintiff's right to significant value for his shares in the family business.

14.     As part of this succession planning sought and encouraged by Plaintiff's mother, Grace Cappelletti, Plaintiff exited Putman's management and executed, in April of 2004, a Put/Option Agreement.

15.     A true and correct copy of the Put/Option Agreement is attached as **Exhibit 1**.

16.     The Put/Option Agreement was executed contemporaneous with the redemption of Grace Cappelletti's stock, her resignation as the sole director of Putman, her resignation from employment and the succession of Plaintiff's brother and Grace's son, John, as Putman's chief executive officer.

17.     The Put/Option Agreement was the product of extensive negotiation by a host of constituent members and their lawyers.

18.     Putman negotiated for, and obtained, a call option under which Putman could force the sale of Plaintiff's stock at any time after the execution of the Put/Option Agreement in April of 2004, through and until December 31, 2015.

3

19.     Plaintiff likewise negotiated for, and obtained, a put option under which Plaintiff could force Putman to purchase Plaintiff's stock, whether owned by Plaintiff individually or through trust.

20.     Under the Put/Option Agreement, Plaintiff could exercise the put option at any time on or prior to December 31, 2015, provided that Putman had satisfied a Put Financial Threshold requirement as defined under Section 3.2 of the Put/Option Agreement.

21.     The Put/Option Agreement also contained "Mandatory Right to Put" in Section 3.3, under which Plaintiff could force Putman to purchase his stock between January 1, 2015 and December 31, 2015 based on a company value of not less than $20 million.  Specifically, Section 3.3 of the Put/Option Agreement provides as follows:

> Mandatory Right to Put.  At any time on or after January 1, 2015 and during the remainder of the Put exercise Period, the Stockholder shall have the right, but not the obligation, to exercise the Put Right even if all of the requirements of the Put Financial Threshold are not satisfied, provided that the purchase by the Corporation of the Stock pursuant to the exercise of the Put Right would not cause the Corporation to be in violation of any applicable insolvency or other law.

22.     Under the Put/Option Agreement, Putman had the right to force the sale of Plaintiff's stock at any time over an 11 ½ year period, while Plaintiff obtained only a conditional right to exercise his put option over the 10 ½ year period spanning April of 2004 and December 31, 2014.  Further, under the Put/Option Agreement, Plaintiff had to wait until after January 31, 2015 before he could exercise his mandatory put right.

23.     The parties extensively negotiated the Floor Price, as defined in Section 5.2 of the Put/Option Agreement, from which certain agreed-upon discounts and deductions would be made to arrive at a minimum price for Plaintiff's pro-rata interest in Putman pursuant to the exercise of either a put or call option.

24.     Specifically, the Floor Price value for Putman was $17 million for the exercise of any put or call option between April of 2004 and December 31, 2010, and $20 million after December 31, 2010, and ending December 31, 2015.

25.     Plaintiff's mandatory put option, as contained in Section 3.3, required Putman to purchase Plaintiff's interest based on a company value of not less than $20 million, the Floor Price applicable to the exercise of any option from January 1, 2015 through December 31, 2015.

26.     By exiting management and employment from Putman and entering into the Put/Option Agreement, and by way of example only, Plaintiff:

      a.     gave up his right to have a voice in the management and direction of Putman;

      b.     gave up a significant salary and benefits;

      c.     gave up incidental personal expenses, including travel and entertainment, that were paid for by Putman;

      d.     agreed to not compete with Putman for so long as Plaintiff was a shareholder in Putman and for one year thereafter;

      e.     agreed to not share any of Putman's confidential information; and

      f.     agreed to restrictions on the transfer of Plaintiff's shares.

27.     Before executing the Put/Option Agreement, Plaintiff offered the same terms to his brother John so that Plaintiff could remain in, and run, the company.   John Cappelletti declined Plaintiff's offer.

28.     The mandatory put option provided a significant and fundamentally important security and safety net to Plaintiff.

29. Plaintiff's security for exiting the management of Putman, and giving up his income, was Plaintiff's mandatory put option under which Putman was required to purchase Plaintiff's interest, at Plaintiff's option, based on a company value of at least $20 million in the year 2015, which was more than 10 ½ years into the future at the time he entered into the Put/Option Agreement.

30. The only exception to Putman's absolute obligation to purchase Plaintiff's stock under the mandatory put right was if the exercise of the put right would "cause the Corporation to be in violation of any applicable insolvency or other law." Put/Option Agreement, Section 3.3.

31. In 2014, John Cappelletti approached Plaintiff and proposed the redemption of Plaintiff's stock at a company valuation of $12 million, significantly less than the $20 million Floor Price associated with the mandatory put option. John Cappelletti justified his offer by claiming that Putman was not worth the $20 million Floor Price. Plaintiff declined.

32. In 2015, John Cappelletti approached Plaintiff and again proposed the redemption of Plaintiff's stock at a company valuation of $12 million and again justified the offer by claiming that Putman was not worth the $20 million Floor Price value. Plaintiff again declined.

33. John Cappelletti's contact and communication with Plaintiff in 2014 and 2015 make clear that Putman, under John's leadership, had no intention of honoring Plaintiff's mandatory put option, if exercised.

34. Plaintiff exercised his mandatory put option on November 3, 2015.

35. Upon Plaintiff's exercise of his mandatory put option, Putman, led by John Cappelletti, orchestrated events and manipulated information in an effort to justify refusing to

redeem stock under Plaintiff's mandatory put right based on a $20 million Floor Value of the company.

36.     Putman initially had its CFO, Rick Kasper, send an email to Plaintiff in December of 2015 claiming that Putman had an insufficient surplus to absorb the $3.36 million purchase obligation to Plaintiff under Plaintiff's mandatory put right option.

37.     A true and correct copy of Kasper's December 28, 2015 email to Plaintiff is attached as **Exhibit 2**.[1]

38.     Kasper's analysis, contained in a memo to the Putman board of directors, acknowledged that it was "not a solvency opinion from a qualified financial services provider."

39.     Kasper's email to Plaintiff likewise acknowledged that the enclosed "memorandum is not a certified opinion on Putman's financial solvency."

40.     Kasper's analysis was patently inappropriate in that it was based on the historical and depreciated book value of Putman and wholly excluded Putman's goodwill and going concern value.

41.     On November 16, 2015, shortly after Plaintiff exercised his mandatory put option, John Cappelletti emailed Plaintiff in pertinent part as follows:

> I have been directed to engage … a qualified financial service provider in securing an opinion on whether Putman would be in violation of any insolvency laws as a result of the magnitude of the transaction under consideration ….

42.     On January 7, 2016, John Cappelletti emailed Plaintiff in pertinent part as follows:

---

[1]     The attachment to this email is not included in this Complaint as an exhibit in order to protect the financial information of the Defendant.

> The BOD [board of directors] has instructed me to get a solvency opinion from a third party, professional services firm, specializing in these matters. I expect that to be completed by mid-February.
>
> You can appreciate that the portion of the put/call agreement referencing "insolvency and other laws" was not an afterthought. There were five legal firms working on the transaction and they were all working to protect their clients.
>
> Everyone involved needs to know whether or not your exercise of the put would cause the company to be in violation of any applicable insolvency or other laws prior to executing a transaction with you.

43.     Later on January 7, 2016, John Cappelletti emailed Plaintiff in pertinent part as follows: "Personally I have always been in favor of getting all the shareholders as much money as possible within the context of being fair to other shareholders."

44.     Putman's obligation to perform under Plaintiff's mandatory put option, however, does no depend on whether redeeming Plaintiff's stock at the $20 million Floor Price – the product of negotiation back in 2004 – was a transaction that the other shareholders deemed fair in 2015.

45.     John Cappelletti's email to Plaintiff referencing fairness to other shareholders, however, reveals his intent and that of Putman to frustrate the exercise of Plaintiff's mandatory put option.

46.     By correspondence dated February 18, 2016, Putman's legal counsel, Robert Krug, Jr., informed Plaintiff's counsel, Robert Shaver, in pertinent part as follows:

> Although not mentioned in your letter, Putman's obligation to purchase Mr. Cappelletti's shares pursuant to the exercise of his put right is conditioned on the payment not violating any applicable insolvency or other law. In such regard to the insolvency issue only, Putman has retained FGMK, a Chicago based accounting firm and upon receipt of their findings, I will provide you with same.

47.     A true and correct copy of Mr. Krug's February 18, 2016 correspondence is attached as **Exhibit 3**.

48.     By email dated March 2, 2016, Putman, through its legal counsel, formally refused to honor its obligation to purchase Plaintiff's shares pursuant to the mandatory put option right contained in the Put/Option Agreement:

> Yesterday Putman Media's board met and unanimously concluded that the purchase of Nick Cappelletti's stock at the Floor Price set in Section 5.2 of the Put/Option Agreement would violate the provisions of the Agreement, more specifically Section 3.3 Mandatory Right to Put.
>
> Attached is the solvency analysis of FGMK which was delivered to the board prior to the meeting.

49.     A true and correct copy of Mr. Krug's March 2, 2016 email is attached as **Exhibit 4**.

50.     The solvency analysis on which the Putman board relied in refusing to honor its obligation to purchase Plaintiff's shares pursuant to the mandatory put option is, as stated on its face, "preliminary" and unsigned.

51.     Through an exchange of email correspondence, Putman confirmed, through its counsel Mr. Krug, that there is no final and signed report and "the only analysis performed by FGMK" on which the Putman board of directors acted upon is the analysis forwarded to Plaintiff's counsel on March 2, 2016, which was both "preliminary" and unsigned.

52.     The "preliminary" and unsigned solvency analysis suggests the thinnest of insolvency margins, specifically a claim that the $3,362,000 redemption transaction with Plaintiff would render the company insolvent by $36,000 on the balance sheet test.

53.     In the words of the "preliminary" and unsigned report: "the fair saleable value of the Putman Media, Inc. assets were ***nominally less*** than its liabilities." (Emphasis added).

9

54.     The assumptions underlying the preliminary solvency analysis were derived from Putman management, specifically including John Cappelletti and Putman's CFO Rick Kasper.

55.     The assumptions underlying the "preliminary" solvency analysis were and are inaccurate and inappropriate, purposefully designed to marginalize and minimize Putman's value.

56.     A modest change to literally dozens of inappropriate assumptions underlying the preliminary solvency analysis would result in a different conclusion, namely, that honoring Plaintiff's mandatory put option would not render Putman "in violation of any applicable insolvency or other law."

57.     The "preliminary" solvency analysis was sought out by Putman in order to justify its improper refusal to avoid Putman's obligation to satisfy Plaintiff's mandatory put right and to deprive Plaintiff of the benefit of the bargain under the 2004 Put/Option Agreement.

58.     By correspondence dated March 31, 2016, Plaintiff, through counsel, demanded that Putman perform and close on the redemption of Plaintiff's stock:

> Under the terms of Article 4 of the Put/Option agreement, closing was to occur not later than 120 days from the date of Mr. Cappelletti's exercise of his Put Option; to wit March 2, 2016. To avoid certain litigation, demand is hereby made for Putman Media to close on the purchase of Mr. Cappelletti's shares of stock at the Floor Price. I ask that you contact me at your next opportunity to schedule the closing.

59.     A true and correct copy of the March 31, 2016 correspondence is attached as **Exhibit 5**.

60.     Putman ignored Plaintiff's demand and refused to close on the redemption of his stock pursuant to his mandatory put option.

## COUNT I – BREACH OF PUT/OPTION AGREEMENT

61.     The above allegations are incorporated by reference.

62.     Plaintiff exercised his mandatory put option on November 3, 2015.

63.     Putman breached the Put/Option Agreement by refusing and failing to redeem Plaintiff's stock under the mandatory put option.

64.     Putman has a five person board of directors, three of whom (including John Cappelletti) are Cappelletti family members and shareholders in the company.

65.     The Cappelletti family directors and shareholders were and are personally motivated to avoid and frustrate Plaintiff's mandatory put option because, at a $20 million Floor Price, the Cappelletti family directors believed that Putman would be overpaying for Plaintiff's stock; and by overpaying for Plaintiff's stock, then the Cappelletti family directors' stock would be worth less.

66.     Accordingly, to enhance and improve their own personal financial interests in Putman, the Cappelletti family members, led by John Cappelletti, voted to deny and frustrate Plaintiff's mandatory put option by claiming, improperly and imprudently, that the transaction would render Putman insolvent.

67.     The truth is that the Cappelletti family directors had no intention of permitting Putman to honor its contractual obligation, set in stone back in 2004, to purchase Plaintiff's stock under the mandatory put option.

68.     The Putman board of directors, in rejecting Plaintiff's mandatory put option, did not act in good faith, or on the basis of appropriate data or assumptions, and its conclusion that honoring the mandatory put option would render the company insolvent is so far off the mark as to constitute actual or constructive fraud.

69.     Not only was Putman's board obligated to utilize good faith, but as a matter of law, they were obligated to do so in an effort ***to satisfy*** the solvency condition contained in Section 3.3 of the Put/Option Agreement.  In other words, Putman was obligated, as a matter of law, to seek to satisfy the condition under the Put/Option Agreement and not, as it did here, to actively seek to frustrate the condition as an excuse for its nonperformance.

70.     Despite promising to secure a "certified opinion" "from a qualified financial services provider," the Putman board of directors denied and rejected Plaintiff's mandatory put option based on a "preliminary" and unsigned solvency analysis.  In effect, the Putman board acted without any solvency opinion at all.

71.     The minutes of the March 1, 2016 board meeting further reveals the lack of good faith by the board.  As it relates to Plaintiff's mandatory put option, the minutes provide as follows:

> Upon reading the solvency analysis that was obtained from FGMK and having a discussion regarding its findings and other laws, the Board agreed the company should not purchase Nick Cappelletti's stock at the floor price.

72.     The Put/Option Agreement mandates the purchase of Plaintiff's stock at a $20 million Floor Price, not whether Putman's board concluded in 2015 that Plaintiff's stock "should" or "should not" be purchased at the Floor Price.  The decision whether to purchase, or at what price, was not before the board of directors; those decisions were fixed under the 2004 Put/Option Agreement.

73.     Further, the "preliminary" and unsigned solvency analysis contains an obvious error in that it fails to add back non-operating assets.  The analysis identifies as an asset $125,000 in employee advances, but wholly fails to add this asset back to its conclusion of value.

Adding back this non-operating asset renders Putman – even under the erroneous and disadvantageous assumptions provided by management – solvent.

74. The "preliminary" and unsigned solvency analysis also fails, entirely, to include normalizing adjustments for personal expenses that are run through Putman in the form of, by way of example only, travel, meals, entertainment, and other personal expenses enjoyed by Cappelletti board members and shareholders that are, upon information and belief, run through Putman.

75. The "preliminary" and unsigned solvency analysis also fails to address the improper compensation paid by the company to John Cappelletti – more than $400,000 in 2015 alone. Accounting for the excessive and inappropriate compensation would further demonstrate that honoring Plaintiff's mandatory put option would not render Putman insolvent.

76. The "preliminary" and unsigned solvency analysis is also based on financial assumptions that are both inaccurate and inappropriate and that were designed to lever the value of the company down. By way of example only:

     a. Putman management forecasted 2016 revenue of $13,618,000 in December of 2015, yet the solvency report only forecasts 2016 revenue of $12,861,000. This difference alone renders Putman solvent under every standard.

     b. The going forward EBIT margin is significantly lower than Putman's typical performance demonstrates. This difference alone renders Putman solvent under every standard.

77.     There are literally dozens of assumptions underlying the "preliminary" and unsigned solvency analysis that, when corrected, would render Putman solvent under every standard.

78.     The denial of Plaintiff's mandatory put option was and is wrongful, done in bad faith, based on inaccurate and improper assumptions, and is so far off the mark as to constitute actual or constructive fraud by Putman and its board members.

79.     Putman breached the 2004 Put/Option Agreement by refusing and failing to redeem Plaintiff's stock under the mandatory put option for $3,362,000.

80.     Plaintiff is damaged in the amount of $3,362,000, plus interest, costs, and attorneys' fees where recoverable by law.

WHEREFORE, Plaintiff requests that judgment enter against Putman Media, Inc. in the amount of $3,362,000, together with interest, costs and recoverable attorneys' fees.

Respectfully Submitted,

RHOADES McKEE, P.C.
Attorneys for Plaintiff

Dated: June 16, 2016                    By: _____
                                         Paul A. McCarthy (P47212)
                                        Business Address:
                                            55 Campau Ave. N.W.
                                            300 Riverfront Plaza Building
                                            Grand Rapids, MI 49503
                                            (616) 233-5133
                                            mccarthy@rhoadesmckee.com

# EXHIBIT 1

## PUT/OPTION AGREEMENT

This PUT/OPTION AGREEMENT ("Agreement") made and entered into as of the 29th day of April, 2004 by and among Nicholas Cappelletti, individually (the "Individual") and as Trustee of the Nicholas Cappelletti Income Trust u/a/d September 16, 1998 (the "Income Trust") and the Nicholas Cappelletti Secondary Trust u/a/d September 16, 1998 (the "Secondary Trust") (collectively, the "Stockholder") and Putman Media, Inc., a Delaware corporation ("Corporation").

## RECITALS:

A.     The Individual owns the following outstanding shares of Class B and Class D Common Stock of the Corporation in his individual and trustee capacity:

78.6 Class B Shares;

222 Class D Shares;

Nicholas Cappelletti, as trustee of the Nicholas Cappelletti Income Trust u/a/d September 16, 1998 - 150 Class D Shares; and

Nicholas Cappelletti, as trustee of the Nicholas Cappelletti Secondary Trust u/a/d September 16, 1998 - 150 Class D Shares.

The above shares and any other shares of the Corporation now or hereafter owned by the Stockholder are referred to in this Agreement as the "Stock."

B.     The Corporation wishes to acquire from the Stockholder the right and option to purchase the Stock on the terms and conditions in this Agreement;

C.     The Corporation wishes to grant the Stockholder the right to sell the Stock to the Corporation on the terms and conditions in this Agreement (the "Put");

D.     The Stockholder desires to grant to the Corporation the right and option to purchase the Stock on the terms and conditions in this Agreement, in consideration of certain amounts payable to the Stockholder by the Corporation;

NOW THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth below, the parties hereto agree as follows:

1.     <u>Consideration for Corporation's Option to Buy</u>.  For and in consideration of the rights and options granted to the Corporation by the Stockholder under this Agreement, the Corporation shall pay to the Stockholder the following annual option payments (the "Option Payments"), as determined in accordance with the formula set forth below, during each calendar year commencing with the 2004 calendar year and continuing through the 2015 calendar year.  Each annual Option Payment shall be

CHI99 4292834-3.046128.0011

payable in two installments, with the installments for the 2004 Option Payment payable on the date hereof and September 1, 2004, and thereafter the installments shall be payable on the 31st day of January and July of each year commencing January 31, 2005. The annual Option Payment for each calendar year shall be based upon the Corporation's projected revenues for the current calendar year, based upon the projections of the Chief Financial Officer of the Corporation, in accordance with the following chart:

| Corporation's Projected Revenue for Current Year | Annual Option Payment |
|---|---|
| $0 to $17,000,000 | $40,000 |
| $17,000,001 to $18,500,000 | $50,000 |
| $18,500,001 to $20,000,000 | $60,000 |
| $20,000,001 and greater | $70,000 |

The amount of the installment of the annual Option Payment due on the date hereof and on September 1, 2004 shall each be $20,000, thereby making the aggregate Option Payment for 2004 equal to $40,000. The amount of the Option Payment for each calendar year shall be adjusted upon the completion of that year in order to properly reflect the actual revenue for that year. Accordingly, if the Corporation determines, upon the completion of any calendar year, that the two installments of the Option Payment paid for that calendar year either exceeded or were less than the amount of the Option Payment that should have been paid based upon the actual revenue of the Corporation for such year, then any such differential shall be added to or subtracted from (as the case may be) the installment of the Option Payment due on January 31. Each installment shall be made on a pro rata basis to the Stockholder in the Stockholder's individual capacity and as trustee of the Income Trust and the Secondary Trust. Such payments shall be paid only so long as the Stockholder still owns any Stock. Any installment of an Option Payment not paid when due shall accrue interest from the date that it is due and until it is paid at the rate of 7.5% per annum.

2. Corporation Option to Buy. At any time, and from time to time, on or after the date hereof and until December 31, 2015 (the "Option Exercise Period"), the Corporation may elect (the "Option Right") to purchase all but not less than all of the Stock then owned by the Stockholder for the purchase price set forth in Section 5 below and, upon the exercise of the Option Right, the Stockholder shall have the obligation to sell all of the Stock to the Corporation (the "Option Transaction") and the Option Payments shall terminate.

3. Stockholder Right to Put Stock to Corporation.

3.1 Grant of Put Right. At any time during the period commencing on the date hereof and ending December 31, 2015 ("Put Exercise Period") when the Corporation is in compliance with the Put Financial Threshold (as hereinafter defined), (i) the

Stockholder shall have the right and option ("Put Right") to sell to, and require the Corporation to purchase, all but not less than all of the Stock, for the purchase price set forth in Section 5 hereof, and (ii) upon exercise of this right, the Corporation shall have the obligation to purchase from the Stockholder all but not less than all of the Stock (the "Put Transaction").

3.2   Put Financial Threshold.   For purposes of this Agreement, the term "Put Financial Threshold" shall mean that all of the following requirements have been satisfied by the Corporation:  (i) Grace E. Cappelletti ("GEC") shall have been paid in full all amounts owed to her by the Corporation (other than payments to GEC for her covenant not to compete); (ii) after the foregoing requirement is satisfied, the Value (as hereinafter defined) of the Corporation shall be equal to or greater than $18,000,000 for one full fiscal year; and (iii) the purchase of the Stock pursuant to the exercise of the Put Right would not cause the Corporation to be in violation of any applicable insolvency or other law.   For purposes of this section, the "Value" of the Corporation shall be determined by an independent appraisal company in an objective and fair manner, taking into account the value of the Corporation's operating assets as determined utilizing the valuation method used in the November 30, 2002 valuation of the operating assets of the Corporation prepared by AdMedia Partners, Inc., provided that for purposes of such valuation a multiple of earnings of eight shall be used and there shall be no recasting of any financial information except for the non-compete payments paid to GEC and the Option Payments paid to Stockholder under this Agreement and similar option payments paid to Jenny Cappelletti.   Notwithstanding the above, the Corporation's Board of Directors, in its sole discretion, may determine that the Value requirement set forth above has been satisfied and thereby waive, in writing, the need for an appraisal.

3.3   Mandatory Right to Put.   At any time on or after January 1, 2015 and during the remainder of the Put Exercise Period, the Stockholder shall have the right, but not the obligation, to exercise the Put Right even if all of the requirements of the Put Financial Threshold are not satisfied, provided that the purchase by the Corporation of the Stock pursuant to the exercise of the Put Right would not cause the Corporation to be in violation of any applicable insolvency or other law.

4.   Notices.   Any election to purchase or sell the Stock hereunder shall be evidenced by a notice in writing to the appropriate party or parties, specifying a closing date (which shall be not more than one hundred twenty (120) days after the date of the notice).

5.   Purchase Price.

5.1   Calculation of Amount.   The purchase price per share for the Stock purchased pursuant to an Option Transaction or Put Transaction (the "Purchase Price") shall be equal to the greater of:  (i) the Floor Price (defined below) or (ii) 7.5 times the Average Annual EBITDA (as hereinafter defined); and in the case of (i) or (ii) of this Section 5.1, less each of the following:  (1) a 15% minority discount; (2) the outstanding principal of promissory notes, if any, from the Corporation to GEC and any bank used to finance any portion of the purchase price paid by the Corporation for the purchase of

GEC's stock (except in the case of (i) above, such debt shall not reduce the Floor Price); and (3) the amount due to Jenny Cappelletti for the purchase of such individual's stock of the Corporation pursuant to any put right or option right similar to that granted hereunder which is consummated prior to the consummation of the Put Right or Option Right granted hereunder; divided by the number of the Corporation's shares of capital stock outstanding. The sum of 50% of each Option Payment paid to Stockholder, will be credited towards, and therefore reduce, the amount of the downpayment for the Purchase Price required under Section 6(i) below.

    5.2   <u>Floor Price</u>.

        (i)   The Floor Price shall be $17,000,000 if the Option Right or Put Right is exercised during the period commencing on the date hereof and ending December 31, 2010; and

        (ii)   the Floor Price shall be $20,000,000 if the Option Right or Put Right is exercised after December 31, 2010 and at any time on or prior to December 31, 2015.

    5.3   <u>Sale of the Company</u>.  Notwithstanding the above, in the event of the Sale, merger or other disposition of the Corporation (collectively, the "Sale"), then the Stockholder and the Corporation shall no longer have the right to exercise the Put Right or Option Right granted hereunder. In the case of a Sale, the Stockholder shall receive the following:

        (i)   if the Sale occurs prior to December 31, 2010, then the Stockholder shall receive the Stockholder's pro rata distribution, in accordance with the Stockholder's respective ownership interest in the Corporation, of the proceeds available following the Sale for distribution to the stockholders of the Corporation, without any discount or reduction, except that the Stockholder's pro rata distribution shall be reduced by 50% of the amount of each Option Payment that the Stockholder received if an amount equal to or more than $17,000,000 is received in the Sale.

        (ii)   If the Sale occurs on or after December 31, 2010, then the Stockholder shall receive the Stockholder's pro rata distribution, in accordance with the Stockholder's respective ownership interest in the Corporation, of the proceeds available following the Sale for distribution to the stockholders of the Corporation, without any discount or reduction, provided that the Stockholder shall receive no less than the Stockholder's pro rata portion of the amount of $15,000,000, except that the Stockholder's pro rata distribution shall be reduced by 25% of the amount of each Option Payment if an amount less than $17,000,000 is received in the Sale and 50% of each such Option Payment if an amount equal to or more than $17,000,000 is received in the Sale.

Stockholder shall receive the amounts payable in (i) and (ii) above in the same manner as the other stockholders of the Corporation are paid. If the consideration received is

not cash, the Stockholder shall be paid, at the Corporation's election, in either cash or non-cash consideration received in the Sale.

5.4    EBITDA.  For purposes of this Agreement, the term Average Annual EBITDA shall mean the average annual Earnings Before Income Taxes, Depreciation and Amortization of the Corporation, as determined in accordance with Generally Accepted Accounting Principles consistently applied (GAAP), as reflected on the Corporation's annual financial statements, during the five (5) fiscal years ending immediately prior to the date that the Put Right or Option Right is exercised.  However, in computing the Average Annual EBITDA, the years having the lowest and highest annual EBITDA during such five-year period shall be excluded.  The elements contributing to the determination of EBITDA shall be classified consistent with the annual financial statements of the Corporation for the fiscal year ended December 31, 2003, heretofore provided to the Stockholder, subject to GAAP in effect from time to time.

6.    Payment.  Upon the closing of either an Option Transaction or a Put Transaction hereunder, the Corporation shall pay to the Stockholder the Purchase Price for such Stock, as follows: (i) ten percent (10%) in cash in immediately available funds (less the amount of any Option Payments to be credited towards this downpayment pursuant to Section 5.1 above and any other credits) and (ii) ninety percent (90%) by a promissory note of the Corporation in the form of Exhibit A.  The promissory note shall be secured by 90% of the Class B and Class D Stock being purchased from Stockholder pursuant to this Agreement, as more fully described in Exhibit A.

7.    Closing of Sales.  All sales hereunder shall be closed at the offices of the Corporation by delivery of the certificates representing the Stock to be sold, duly endorsed for transfer or accompanied by duly executed stock powers, with signatures guaranteed, against payment of the Purchase Price in the manner authorized herein.

8.    Stock Purchase Agreement.  Stockholder, in his individual capacity, is entering into a certain Stock Purchase Agreement (the "Stock Purchase Agreement") of even date herewith with Grace E. Cappelletti and John M. Cappelletti, as trustees of Trust B under the John M. Cappelletti Trust dated January 2, 1980 ("Trust B").  If the Corporation has purchased the Stockholder's Stock pursuant to the exercise of a Put Right or an Option Right at the time when the remaining unpaid principal balance on the promissory note ("Option Note") issued to Stockholder in connection with such purchase of the Stockholder's Stock is equal to $240,000, then Stockholder hereby irrevocably directs the Corporation to pay the remaining $240,000 of principal payments under the Option Note directly to Trust B in satisfaction of the Stockholder's Promissory Note executed pursuant to the Stock Purchase Agreement.

9.    Rights of Stockholder.

9.1    Participation and Observer Rights.  During the period commencing on the date hereof and ending April 29, 2005, the Stockholder shall have Participation Rights (as hereinafter defined) at the Corporation's Board of Directors meetings.  Thereafter, so long as the Stockholder owns Stock in the Corporation or is a creditor of the

Corporation owed at least $1,000,000, the Stockholder shall have Observer Rights (as hereinafter defined). However, if the Stockholder has Observer Rights, such rights will revert to Participation Rights if the Corporation is in default for three (3) consecutive months on any of its Payment Obligations (as hereinafter defined), but thereafter if the Corporation has been in compliance with its Payment Obligations for three (3) months, then such rights will revert back to Observer Rights. For purposes of this Agreement, the term "Participation Rights" shall mean the right of the Stockholder to participate in all special and annual meetings of the Corporation's Board of Directors meetings, without having any voting rights. The term "Observer Rights" shall mean the right of the Stockholder to observe at all annual and special meetings of the Corporation's Board of Directors, without having the right to vote or participate in discussions at any such meetings. For purposes of this Agreement, the term "Payment Obligations" shall mean the obligation of the Corporation to: (i) pay Stockholder the Option Payments under Section 1 hereof; (ii) make payments to Stockholder pursuant to the exercise of an Option Right or a Put Right; (iii) pay Jenny Cappelletti similar option payments pursuant to his/her Put/Option Agreement with the Corporation and to make payments to her pursuant to the exercise of an option right or a put right under his/her Put/Option Agreement with the Corporation; (iv) pay any amounts required to be paid by the Corporation to GEC pursuant to the Stock Redemption Agreement between the Corporation and GEC (excluding any amounts payable for GEC's covenant to compete); and (v) pay any amounts owed to any bank under the loan documentation executed to finance the stock redemption of GEC, or to any successor bank in the event of a refinancing of such loan. Unless an obligation is specifically set forth in subparagraphs (i) through (v) of this section, it shall not be deemed to be included as Payment Obligations.

9.2    <u>Right to Serve as a Director</u>. Notwithstanding the above, if at such time the Stockholder is a creditor of the Corporation owed at least $1,000,000 and the Corporation is in default for twelve (12) consecutive months on any of its Payment Obligations, then the Stockholder shall have the right to serve as a member of the Corporation's Board of Directors during such period of time that the default is continuing. Once no default exists, Stockholder shall no longer be entitled to serve as a director and shall automatically be deemed to have been removed as a director (without any action required on the part of the Corporation or the Stockholder).

9.3    <u>Right to Financial Information</u>. During such time that Stockholder owns Stock in the Corporation or is a creditor of the Corporation, the Stockholder shall be entitled to receive the following financial information from the Corporation: (i) copies of the financial information that is provided to the directors of the Corporation, including but not limited to, the Corporation's annual financial statements, quarterly financial statements, and federal income tax returns; and (ii) a detailed financial statement including business unit detail reasonably necessary to allow Stockholder to determine the financial status of each business unit of the Corporation. The foregoing information shall be provided to Stockholder in a timely manner.

9.4    <u>Access to Certain Facilities</u>. The Corporation from time to time may own or maintain a facility (for instance, a corporate apartment) for use by the Corporation's employees, customers, prospective customers and others for business purposes. If any

such facility is not being used for such purposes and is made available for temporary non-business use to any other stockholders of the Corporation, then Stockholder shall be entitled to participate in such use on a basis similar to that of the other stockholders, provided that Stockholder provides the Corporation with reasonable advance notice of Stockholder's desire to use the facility on a particular date.

10. <u>Supermajority Vote for Certain Matters</u>. Except for any transaction made pursuant to this Agreement, so long as Stockholder owns Stock, the following matters will require the Supermajority Approval (as hereinafter defined) of the Corporation's Stockholders: (i) any dividend or redemption of stock of the Corporation in excess of the amount provided for or required to be made by the Corporation in any of the agreements heretofore executed by the Corporation or executed by the Corporation in connection with this Agreement; (ii) any acquisition in excess of $1,000,000; (iii) any amendment to the Corporation's Certificate of Incorporation or by-laws; (iv) any issuance of new stock of the Corporation in excess of five percent (5%) of the Corporation's capital stock; (v) the merger or consolidation of the Corporation or the sale, transfer or other disposition of all or substantially all of the assets of the Corporation; (vi) any changes in the president and chief executive officer positions; (vii) any change in the nature of a substantial portion of the business from business communications; and (viii) any matter resulting in a "Change in Control" (as defined below) of the Corporation. For purposes of this section, a "Change in Control" shall mean a change in ownership of the Corporation's stock resulting in John M. Cappelletti, Julie Cappelletti-Lange and Melody Cappelletti or trusts solely for their benefit or for the benefit of their spouses or descendants owning, in the aggregate, less than fifty percent (50%) of the Corporation's stock. The term "Supermajority Approval" shall mean the approval of the holders of more than sixty-five percent (65%) of the capital stock of the Corporation.

11. <u>Restriction on Transfer of Shares</u>. Except as otherwise expressly provided herein, Stockholder shall not, voluntarily or involuntarily, by operation of law or otherwise, sell, assign, transfer, give, pledge, hypothecate, encumber or otherwise dispose of all or any part of the Stock without the written consent of the Corporation's Board of Directors. In the event of the Stockholder's death or Involuntary Transfer (as hereinafter defined) of any Stock during the Option Exercise Period, the Corporation and Stockholder's successor(s) in the event of his death shall retain the right to exercise the Option Right and Put Right in accordance with this Agreement. In the event of the Stockholder's death or Involuntary Transfer of any Stock subsequent to the expiration of the Option Exercise Period, the Corporation shall have the right to purchase the Stockholder's Stock for "Fair Value" (as defined below) as determined by the outside accounting firm then serving the Corporation, for a period of ninety (90) days after receiving notice of the death or Involuntary Transfer. The purchase price shall be payable in the manner set forth in Section 6 above. For purposes of this Section, the following definitions shall apply:

(i) an Involuntary Transfer shall mean that any stock is subject to an involuntary lien, secure or transfer by operation of law (including, without limitation, any involuntary transfer in connection with any dissolution of marriage proceeding or bankruptcy or insolvency proceeding or assignment for the benefit

of creditors or a sale to satisfy a tax lien, an execution to satisfy a judgment or a transfer compelled by a court or authority;

     (ii)    the term "Fair Value" shall mean the price at which the Stock would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy and to sell and both having reasonable knowledge of relevant facts, taking into account a 15% minority discount.

Notwithstanding the above, the Corporation shall not have the purchase right set forth above in this Section 10 in the event the Stockholder dies and his or her stock is transferred to his or her spouse or descendents, and/or trusts solely for the benefit of such spouse and/or descendents and of which such individual(s) serve as trustee, provided, if descendants, they are also descendants of GEC and if a spouse of a descendant, he or she is the spouse of a child of GEC and further provided that any such transferee(s) whatsoever agree in writing to be a party to, and be bound by, all of the terms and conditions of this Agreement, and the provisions of this Agreement, including the restrictions in this Section 11, shall be binding upon any and all such transferees.

     12.    Tag-Along Rights.  In the event that one or more of John M. Cappelletti, Julie Capelletti-Lange and Melody Cappelletti (the "Tag Along Electing Stockholders") elects to sell, transfer or exchange, by sale of shares, merger or otherwise, to any person or entity (other than to one or more of the Tag Along Electing Stockholders) all or any portion of shares of the Corporation's Stock held by him or her or any trust for his or her benefit, then the Tag Along Electing Stockholders shall provide written notification (the "Tag Along Notice") of the terms and conditions of such sale, transfer or exchange to the Stockholder and all other stockholders of the Corporation (collectively, the "Other Stockholders").  The Other Stockholders shall then have the right to participate in such sale, transfer or exchange, on a Pro Rata Basis in accordance with their respective ownership of shares of stock of the Corporation ("Shares"), and on the same terms and conditions as set forth in the Tag Along Notice, by providing written notification to the Tag Along Electing Stockholders of their intention to do so within twenty (20) days of receiving the Tag Along Notice.  In the event that any of the Other Stockholders elect by written notice within the aforesaid twenty (20) day period to participate in such sale, transfer or exchange (the "Minority Tag Along Stockholders"), then the Tag Along Electing Stockholders shall be required to consummate such sale, transfer or exchange of both their Shares and the Shares of the Minority Tag Along Stockholders or, in the alternative, not sell, transfer or exchange any of the Tag Along Electing Stockholders' Shares.

     13.    Maintenance of Subchapter S Treatment.  So long as the Corporation elects to be treated as an S corporation under Subchapter S ("Subchapter S") of Subtitle A of the Internal Revenue Code of 1986, as amended (the "Code"), Stockholder shall not engage in any transaction involving any of the Stock or take any other action which, in the reasonable judgment of the Corporation, would result in the Corporation ceasing to be a "small business corporation" as defined in Section 1361(b)(1) of the Code or would otherwise result in the termination of the Corporation's election to be treated as an S Corporation under Subchapter S of the Code (except for an intentional

revocation of such election by the holders of more than one-half of the then outstanding shares of the Corporation's Stock). If an amendment to Subchapter S of the Code subsequent to the execution of this Agreement renders one or more provisions of this Agreement the cause of a termination of the Corporation's S election, such provisions shall be void and of no effect and the remaining provisions of this Agreement shall be construed in a manner necessary to continue such election. Stockholder hereto agrees that should he or she violate this Agreement and cause a termination of the Corporation's S election, he or she will indemnify and hold harmless the other stockholders of the Corporation with respect to any damages that result from the termination, including any tax liabilities and interest thereon which are incurred as a result of such termination (but would not have been incurred except for such termination).

14.    Confidentiality; Non-Competition Covenants.    In order, among other things, to provide adequate protection for the Corporation's valuable rights and interests and into its business, goodwill, relationships, intellectual property and other assets, the Corporation and the Stockholder agree as follows:

14.1    Non-Disclosure of Confidential Information.    Stockholder acknowledges that during the course of his or her relationship with the Corporation as a Stockholder, he or she has in the past has had access to, and may in the future gain access to, confidential information of the Corporation including, without limitation, customer lists, trade secrets, methods and processes involved in providing services and products, marketing and sales techniques, computer data and information, financial data and other information and knowledge relating to the business of the Corporation (collectively, "Confidential Information"). Stockholder, while owning any Stock or at any time thereafter, will not, without the prior written consent of the Corporation's Board of Directors ("Board"), directly or indirectly communicate or divulge to, or use for Stockholder's own benefit or for the benefit of any other person or entity, any Confidential Information which was acquired by Stockholder during the course of Stockholder's association with the Corporation as a stockholder or otherwise. Nothing in this Agreement, however, will prohibit Stockholder from using or disclosing Confidential Information to the extent required by law. If Stockholder is required by applicable law to disclose any Confidential Information, then Stockholder will (a) provide the Corporation with prompt notice before such disclosure in order that the Corporation may attempt to obtain a protective order or other assurance that confidential treatment will be accorded such information and (b) reasonably cooperate, at the expense of the Corporation, with the Corporation in attempting to obtain such order or assurance. Confidential Information does not include information, technical data or know-how which:

(i)    is developed independently by Stockholder after the date of this Agreement;

(ii)    is generally known within the industry or is otherwise available through independent sources owing no duty of confidentiality to the Corporation; and

(iii)     becomes part of the public domain through no fault of Stockholder or any agent of Stockholder.

It is understood and agreed by the parties hereto that this Section 14.1 does not constitute a non-compete agreement, and the Stockholder may use his business knowledge, whether gained working for or being a stockholder of the Corporation, and may engage in the publishing business, so long as any Confidential Information is not disclosed or used in violation of this Section 14.1 and except as provided in Section 14.2 below.

14.2    Non-Competition Covenants.  So long as Stockholder owns any Stock and for a period of one (1) year following the termination of such ownership, Stockholder shall not participate in any Restricted Activity in the United States without the prior written consent of the Corporation.  For purposes hereof, "Restricted Activity" shall mean to directly or indirectly (including, without limitation, through any affiliate), alone or in association with others, own, manage, operate, control or participate in the ownership, management, operation or control of, or be connected as an officer, employee, investor, principal, joint venturer, stockholder, partner, member, director, consultant, agent or otherwise with, or have any financial interest (through stock or other equity ownership, investing of capital, lending of money or otherwise) (other than wholly passive ownership of less than five percent (5%) of the outstanding equity securities of any class registered under the Securities Exchange Act of 1934, as amended) any magazine that the Corporation tracks a share of the market with.

14.3    Return of Information.  Promptly after the termination of Stockholder's ownership of Stock, Stockholder will deliver to the Corporation all originals and copies of memoranda, customer lists, records, documents, computer programs and other Confidential Information which such Stockholder has obtained in the course of his or her association with the Corporation.

15.    Board of Directors.  The Corporation's Board of Directors, consisting of five (5) directors, will be established and all such positions filled, within ninety (90) days from the date of this Agreement.  If the Board is not filled within such time frame, Stockholder and Jenny Cappelletti shall designate individual(s) to fill the vacant seat(s).

16.    Non-Competition Agreements.  The Corporation hereby represents and warrants to Stockholder that the Corporation has entered into certain agreements with the Corporation's publisher with respect to each of its magazines containing restrictions on their ability to compete with the Corporation, and the Corporation will use reasonable business efforts to obtain agreements containing similar restrictions from any successors to those executives and from any other key publishing executives that are hired in the future by the Corporation.

17.    Endorsement of Stock Certificates.  All certificates representing Stock now owned or hereafter acquired by any Stockholder shall be endorsed as follows:

"Putman Media, Inc. has the right and in certain circumstances, may have the obligation to purchase this

certificate and the shares represented hereby under the circumstances contained in an agreement dated as of April. 29, 2004 by and among Putman Media, Inc. and certain of its shareholders, a copy of which agreement is on file with the Secretary of the Corporation. A copy of such agreement will be furnished by the Corporation to any shareholder upon request and without charge."

18.    Termination and Amendment.  Except for consummating purchases with respect to which an election has theretofore been made hereunder, this Agreement shall terminate and have no further effect upon the earliest to occur of the bankruptcy, receivership or dissolution of the Corporation or the cessation of its business. This Agreement may be altered, amended or terminated at any time only pursuant to an agreement in writing executed by the Corporation and the Stockholder.

19.    Notices.  All notices hereunder shall be in writing and shall be deemed to be communicated when delivered in person or deposited in the United States mail, postage prepaid, by registered mail, addressed to the party concerned at the address of such party appearing on the Corporation's records, or at such other or additional place as such party may designate by notice given in accordance with the provisions hereof to the other parties.

20.    Binding Effect Benefit.  This Agreement shall be binding upon the parties, their heirs, legal representatives, successors and assigns.  Anything to the contrary notwithstanding, all of the rights and obligations of the Corporation and the Stockholder hereunder shall continue with respect to any Stock subject to the terms hereof, notwithstanding any transfer thereof shall receive and hold such Stock subject to all of the rights and obligations contained in this Agreement.

21.    Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without regard to conflicts of laws principles.  The parties hereby irrevocably consent to jurisdiction of any state or federal court in Cook County, Illinois for purposes of any action or proceeding relating to or arising out of this Agreement, and hereby waive any objection to venue in such action or proceeding.

22.    Severability.  In the event any provision of this Agreement shall be held invalid or unenforceable according to law, such holding or action shall not invalidate or render unenforceable any other provision hereof and the court is instructed to eliminate the offending provision and give full force and effect to the remaining language; provided, however, that upon any finding by a court of competent jurisdiction that any covenant of Section 14.1 or 14.2 is illegal, void or unenforceable, Stockholder agrees, at the Corporation's option, to execute a covenant that is valid and enforceable.

23.    Injunctive Relief.  Stockholder agrees and acknowledges that, with respect to a potential, anticipatory or actual breach of his obligations and covenants under Section 14.1 or 14.2, the Corporation will sustain irreparable injury and will not have an adequate remedy at law.  As such, it may be necessary or appropriate for the

Corporation to seek injunctive relief in order to avoid irreparable harm. If the Corporation desires injunctive relief, then Stockholder agrees to waive any bond, surety or other security that may be required of the Corporation.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement the day and year first above written.

PUTMAN MEDIA, INC.

By: _____
        President

Stockholder:

_____,
Nicholas Cappelletti, individually and as Trustee of the Nicholas Cappelletti Income Trust u/a/d September 16, 1998 and the Nicholas Cappelletti Secondary Trust u/a/d September 16, 1998

The undersigned hereby sign below solely for the purposes of being bound by Sections 12 and 15 above.

_____,
John M. Cappelletti, Individually and as Trustee of The John M. Cappelletti Income Trust u/a/d September 16, 1998 and The John M. Cappelletti Secondary Trust u/a/d September 16, 1998

_____,
Julie Cappelletti Lange, Individually and as Trustee of The Julie Lange Income Trust u/a/d September 16, 1998 and The Julie Lange Secondary Trust u/a/d September 16, 1998

_____,
Melody Cappelletti, Individually and as Trustee of The Melody Cappelletti Income Trust u/a/d September 16, 1998 and The Melody Cappelletti Secondary Trust u/a/d September 16, 1998

**EXHIBIT A**

## TERM NOTE

_____,20__
Chicago, Illinois

FOR VALUE RECEIVED, the undersigned Putman Media, Inc. (the "Corporation"), hereby promises to pay to the order of _____, a ("Stockholder"), the principal sum of _____ ($_____) (the "Principal"), with interest at the rates hereinafter set forth. Payments of interest shall be payable quarterly on the first day of each quarter beginning on _____, 20__. Payment of principal shall be payable in forty (40) equal quarterly installments on the first day of each quarter, beginning on _____, 20__.

Corporation's obligations hereunder unpaid from time to time shall bear interest (computed on the basis of a 360 day year and actual days elapsed) from the date hereof until paid at a per annum rate of ____%, being the Applicable Federal Rate on the date hereof plus 1.5% **[in no event shall this interest rate exceed 7.5%]**. All interest shall be paid as described above. Upon an event of default under this Note, interest shall be due and payable.

This Note may be prepaid in whole or in part at any time or from time to time, without premium or penalty. If any provision of this Note is held invalid or unenforceable, the remainder of this Note will not be affected thereby, the provisions of this Note being severable in any instance.

If any amount payable under this Note becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day, and interest shall be payable thereon at the rate herein specified during such extension.

This Note shall be governed by the laws of the State of Delaware, without regard to conflicts of laws principles.

In case this Note shall be lost, stolen or destroyed, the Stockholder shall issue a new Note of like date, tenor and denomination and deliver the same in exchange and substitution for the Note upon receipt of evidence satisfactory to the Stockholder of the loss, theft, destruction or mutilation of the Note.

To secure payment of the amounts owed under this Note, the Corporation hereby delivers, pledges and deposits and grants a security interest to Stockholder in, as collateral, stock certificates registered in the name of the Stockholder representing _____shares of Class B Common Stock and _____shares of Class D Common Stock of the Corporation, which shares represent 90% of the Class B Common Stock and Class D Common Stock of the Corporation purchased by the

Corporation from Stockholder pursuant to a certain Put/Option Agreement dated April 29, 2004 (the "Put/Option Agreement"). Also delivered herewith is an executed assignment separate from certificate in blank for each such certificate in form good for transfer in blank. Upon each quarterly installment of principal and interest under this Note, shares of Class B and Class D Common Stock equal to 1/40 of the entire number of shares of each of such classes pledged under this Note shall be released as collateral hereunder to the Corporation, and Stockholder shall have no further security interest with respect to such released shares.

The certificates representing the shares pledged pursuant to the preceding paragraph shall be deposited and held in escrow with Stockholder's attorney, as escrow agent and held by such escrow agent pursuant to a written escrow agreement of even date herewith.

Upon the occurrence and continuance for a period of nine (9) consecutive months of any default in payment of principal or interest due under this Note, the Stockholder may enforce the rights available to it as a secured creditor under the Uniform Commercial Code with respect to the stock then remaining as security under this Note.

Stockholder, in his individual capacity, is entering into a certain Stock Purchase Agreement (the "Stock Purchase Agreement") of even date herewith with Grace E. Cappelletti and John M. Cappelletti, as trustees of Trust B under the John M. Cappelletti Trust dated January 2, 1980 ("Trust B"). If the Corporation has purchased the Stockholder's stock pursuant to the exercise of a Put Right or Option Right under the Put/Option Agreement and the remaining unpaid principal balance under this Note is equal to $240,000, then Stockholder hereby irrevocably directs the Corporation to pay the remaining $240,000 of principal payments under this Note directly to Trust B in satisfaction of the Stockholder's Promissory Note executed pursuant to the Stock Purchase Agreement.

PUTMAN MEDIA, INC.

By: _____

Title: _____

# EXHIBIT 2

## Robert C. Shaver

| | |
|---|---|
| **From:** | Nick Cappelletti <ncappelletti@mac.com> |
| **Sent:** | Thursday, January 07, 2016 1:56 PM |
| **To:** | Robert C. Shaver |
| **Subject:** | CFO balance sheet |
| **Attachments:** | Memorandum re Nicks Put Right and PMI Financial Impact from CFO 12-28-15.pdf |

Begin forwarded message:

> **From:** Rick Kasper <rkasper@putman.net>
> **Date:** December 28, 2015 5:38:29 PM
> **To:** Nick Cappelletti <ncappelletti@mac.com>
> **Subject: Updated financial information**
>
> *Confidential and Restricted Putman Information*
>
> Hi Nick,
>
> At the direction of Putman's Board of Directors, I have prepared a memorandum, addressing the financial impact of your stock redemption at the Put Right value on Putman's re-forecast 2 balance sheet at 12-31-15. They have reviewed the memorandum and asked me to share it with you.
>
> As my attached memorandum explains, the Put Right value, per the agreement is straightforward math. I believe that Putman's year end balance sheet will be close to the numbers presented, prior to considering the redemption impact. The numbers I used are consistent with the financial presentation in the Board of Director's binder for the 12-1-2015 meeting. The numbers shows that Putman's Stockholder Equity (surplus) at 12-31-15 is materially insufficient to absorb the redemption at Put Right value.
>
> This memorandum is not a certified opinion on Putman's financial solvency. While I believe that a qualified firm will concur with my numbers, the Board understands that you may request such certification and they have directed me to recommend such a firm. My preliminary research has found that these firms (typically large CPA firms and Valuation/ Equity/ Investment firms) are very expensive and engagements can take six to ten weeks to produce a certified solvency opinion.
>
> Please let me know of any questions you have on my memorandum and any of the numbers presented. Anton Hendler, Partner at Lipschultz, Levin and Gray, CPA's is also available for financial questions. Meanwhile, I will continue my research on a firm qualified to present the certified solvency opinion. We will not formalize the engagement and spend the money until we hear from you.
>
> Sincerely,
>
> --

Rick Kasper
rkasper@putman.net
630-467-1300 x405
630-625-1121 direct
312-772-5432 mobile
630-467-1300 x714 Finance General
630-467-0195 fax

# EXHIBIT 3

# KELLEHER & BUCKLEY, LLC
## ——— A T T O R N E Y S   A T   L A W ———

102 S. WYNSTONE PARK DR. I NORTH BARRINGTON, IL 60010
TEL: 847-382-9130 I FAX: 847-382-9135 I WWW.KELLEHERBUCKLEY.COM

DAVID P. BUCKLEY, JR., J.D., C.P.A.[1]
ANDREW J. KELLEHER, JR., J.D., C.P.A., LL.M.[1,4]

A LIMITED LIABILITY COMPANY
INCLUDING PROFESSIONAL CORPORATIONS

WARREN R. FULLER, J.D.
ROBERT F. KRUG, JR., J.D.
MICHAEL P. MCELROY, J.D.
MARTHA E. MCHUGH, J.D.
VASILI D. RUSSIS, J.D., C.P.A.
HELMUT E. GERLACH, J.D.[5,6]
LINDA S. FINE, J.D.
ROBERT A. HOLLAND, J.D., C.P.A.[2]
RAYMOND M. RUDNICK, J.D.
MICHAEL GNESIN, J.D.
SAMUEL J.H. WEYERS, J.D.

DEANNA L. AGUINAGA, J.D.
CHRISTIAN T. DEME, J.D.[3]
ANDREW B. FULLER, J.D.
CAROLINE E. HECHT, J.D.[3]
JOSEPH P. HUDETZ, J.D.
EDWARD P. MCCAULEY, J.D.
NICOLE S. POWELL, J.D.
KEITH A. ZERMAN, J.D.

OF COUNSEL:
ROBIN R. KELLEHER, J.D.
HON. HENRY "SKIP" TONIGAN, RET.

ATTORNEYS ALSO LICENSED IN FLORIDA[1], CALIFORNIA[2],
WISCONSIN[3], ARIZONA[4], MARYLAND[5] & DISTRICT OF COLUMBIA[6]

February 18, 2016

Robert C. Shaver, Esq.
Rhoades McKee
55 Campau Avenue NW, Suite 300
Grand Rapids, MI   49503

Re:  Put/Option Agreement dated April 29, 2004

Dear Mr. Shaver:

Please be advised my firm represents Putman Media, Inc. ("Putman").  In such regard, I am in receipt of your letter dated February 5, 2016 which was received by Putman on February 16, 2016.

Although not mentioned in your letter, Putman's obligation to purchase Mr. Cappelletti's shares pursuant to the exercise of his put right is conditioned on the payments not violating any applicable insolvency or other law.  In such regard to the insolvency issue only, Putman has retained FGMK, a Chicago based accounting firm and upon receipt of their findings, I will provide you with same.

My client is assembling the documents your client is entitled to under Section 9.3 of the Put/Option Agreement which I will make available to your office.

Should you have any questions, please feel free to contact the undersigned.

Very truly yours,

ROBERT F. KRUG, JR.

# EXHIBIT 4

**Paul A. McCarthy**

**From:**      Robert F. Krug <RKrug@kelleherbuckley.com>
**Sent:**      Wednesday, March 23, 2016 1:52 PM
**To:**        Robert C. Shaver
**Subject:**   RE: Putman Media, Inc.

Hi Bob,

There is presently not a final report and the only analysis performed by FGMK is the one I attached and forwarded to you on March 2, 2016.

I have additional documents for you which I will email shortly.

Regards,

**Robert F. Krug, Jr.**

**Kelleher & Buckley, LLC**

**102 S. Wynstone Park Drive, Suite 100**

**North Barrington, IL   60010**

**Direct (847) 713-1348**

**Fax: (847) 382-9135**

rkrug@kelleherbuckley.com

www.kelleherbuckley.com

**From:** Robert C. Shaver [mailto:rcshaver@rhoadesmckee.com]
**Sent:** Tuesday, March 22, 2016 12:14 PM
**To:** Robert F. Krug <RKrug@kelleherbuckley.com>
**Subject:** FW: Putman Media, Inc.

1

Mr. Krug – I've been out of the office for the past 10 days and somehow, before leaving, overlooked your email, below. I intend to review the analysis with Mr. Cappelletti. In the meantime, the analysis indicates that its "preliminary;" is there a final analysis or is the attached analysis the final report? Please let me know. Thank you.

Robert Shaver

 rhoades mckee attorneys

Tel: 616.233.5143
Fax: 616.233.5269
Email:rcshaver@rhoadesmckee.com

55 Campau Avenue NW, Suite 300
Grand Rapids, Michigan 49503
rhoadesmckee.com



**From:** Robert F. Krug [mailto:RKrug@kelleherbuckley.com]
**Sent:** Wednesday, March 02, 2016 12:10 PM
**To:** Robert C. Shaver
**Subject:** Putman Media, Inc.

Mr. Shaver,

Yesterday Putman Media's board met and unanimously concluded that the purchase of Nick Cappelletti's stock at the Floor Price set in Section 5.2 of the Put/Option Agreement would violate the provisions of the Agreement, more specifically Section 3.3 Mandatory Right to Put.

Attached is the solvency analysis by FGMK which was delivered to the board prior to the meeting.

Regards,

*Robert F. Krug, Jr.*

*Robert F. Krug, Jr.*

*Kelleher & Buckley, LLC*

*102 S. Wynstone Park Drive*

*North Barrington, IL 60010*

*Direct (847)713-1348*

*Fax (847)382-9135*

*rkrug@kelleherbuckley.com*

*www.kelleherbuckley.com*



**P** Please consider the environment before printing this e-mail.

*This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (847.382.9130) and destroy this message.*

*If you are not already a client of Kelleher & Buckley, LLC, Attorneys at Law, you may not rely on this message to create such a relationship and you may not rely on any advice in this message.*

CONFIDENTIALITY NOTICE: This message and any attachment contain attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this message in error, please notify us immediately by return email and delete this message and any attachment from your system. DISCLOSURE UNDER TREASURY CIRCULAR 230: To ensure compliance

# EXHIBIT 5

 rhoades
mckee
attorneys

Robert C. Shaver | Attorney

office    616.235.3500
direct   616.233.5143          55 Campau Avenue NW
fax      616.233.5269          Suite 300
email    rcshaver@rhoadesmckee.com          Grand Rapids, MI 49503

March 31, 2016

*Via Email to: rkrug@kelleherbuckley.com*
Mr. Robert F. Krug, Jr.
Kelleher & Buckley, LLC
102 S. Wynstone Park Drive
North Barrington, Illinois  60010

Re:    Put/Option Agreement dated April 29, 2004

Dear Mr. Krug:

This letter follows your email dated March 2, 2016.  In your email you write "[y]esterday Putman Media's board met and unanimously concluded that the purchase of Nick Cappelletti's stock at the Floor Price set in section 5.2 of the Put/Option agreement would violate the provisions of the Agreement, more specifically section 3.3 Mandatory Right to Put."  Attached to your email, and as support for the board's decision, was the Preliminary Solvency Analysis report of FGMK.

Under Section 3.3 of the Put/Option Agreement, Putman Media is contractually obligated to purchase Mr. Cappelletti's shares of stock unless the purchase would cause Putman Media to be in violation of any applicable insolvency law.  My law partner, Paul McCarthy, and I have reviewed the solvency analysis with Mr. Cappelletti and, in our judgment, the extremely narrow insolvency, as reflected in the report, yields an entirely different outcome when one or more of the underlying financial assumptions or management estimates used in the report is properly adjusted.  The board's decision not to authorize Putman Media to purchase Mr. Cappelletti's shares of stock under the Put/Option contract is wrongful and is clearly an effort of John Cappelletti's desire to avoid Putman Media's obligation to his brother, Nick, as negotiated and agreed upon years ago.

Under the terms of Article 4 of the Put/Option Agreement, closing was to occur not later than 120 days from the date of Mr. Cappelletti's exercise of his Put Option; to wit March 2, 2016.  To avoid certain litigation, demand is hereby made for Putman Media to close on the purchase of Mr. Cappelletti's shares of stock at the Floor Price. I ask that you contact me at your next opportunity to schedule the closing.

Very truly yours,

RHOADES McKEE PC

Robert C. Shaver
Direct Dial Telephone: (616) 233-5143
E-Mail: shaver@rhoadesmckee.com

rhoadesmckee.com